Phillip D. CHAMPAGNE,
Plaintiff, Appellant,

v.

SERVISTAR CORPORATION,
Defendant, Appellee.

No. 97–1947.

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 1998.
Decided March 12, 1998.

8

Edward M. Pikula, Springfield, MA, for appellant.

Charles P. Roberts, III, with whom Haynsworth, Baldwin, Johnson and Greaves, Jacksonville, FL, Daniel Finnegan, and Bulkley, Richardson and Gelinas, Springfield, MA, were on brief, for appellee.

Before TORRUELLA, Chief Judge, BOUDIN and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

Phillip D. Champagne sued his former employer Servistar Corporation under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213. Champagne, a truck driver, alleged that Servistar unlawfully terminated his employment because he was disabled. His disability, he said, was that he suffered from emotional disorders which required him to drive only familiar routes, avoid high bridges, and not rotate truck routes as did other Servistar drivers. Champagne also alleged that his termination was in retaliation for his filing disability discrimination charges and that Servistar threatened to withdraw the workplace accommodation it had earlier given him. The district court rejected these claims in a carefully reasoned opinion granting summary judgment. We affirm.

I

As summary judgment has been granted, we review the facts in the light most favorable to Champagne and will draw all reasonable inferences in his favor. *See Soileau v. Guilford of Maine*, 105 F.3d 12, 13 (1st Cir.1997). Because the issue of causation as to the termination of Champagne's employment is largely dispositive of the case, we focus particularly on those facts.

Servistar is a cooperative engaged in the distribution of hardware, lumber, and building materials to approximately 3,700 owner-member stores nationwide. In June 1974, Servistar hired Champagne as a truck driver at its Westfield, Massachusetts distribution center ("Westfield terminal"). Champagne, one of approximately twenty regular truck drivers at the Westfield terminal, operated a tractor-trailer and delivered merchandise to stores throughout New England and eastern New York.

At the time of Champagne's hiring, Servistar had a long-standing policy of requiring drivers to rotate their routes on a periodic basis. The object of this policy was to better monitor driver productivity by comparing different drivers on the same route, obtain better feedback on customers' needs by gaining the perspective of numerous drivers, and equalize pay, work load, and overall driver responsibilities. Champagne, like all Servistar drivers, was subject to this policy.

In the mid–1980's, Champagne began to develop emotional problems which increasingly interfered with his ability to rotate routes. These problems included general anxiety, feelings of despair, suicidal tendencies, and a specific phobia of crossing bridges. Champagne told his psychiatrist, Dr. Carl Saviano, that he sought to avoid bridges with which he was unfamiliar or thought unsafe (Champagne especially feared high bridges with low railings) for fear that he would commit suicide by driving off the bridge. Champagne did not inform Servistar of his condition. In 1988, Champagne asked his supervisor at the Westfield terminal to exempt him from route-rotation and to allow him to drive a set route. Champagne's supervisor granted this request. In 1990, Champagne fell into a major depression and was hospitalized for two weeks in the psychiatric unit at the Cooley–Dickinson Hospital in Northampton, Massachusetts.

When other drivers at the Westfield terminal began to complain about Champagne's exemption from the route rotation system, Servistar's Vice President of Human Resources, Russell Thomas, asked Champagne to supply a medical reason for driving a set route. In November 1990, Champagne produced a note from Dr. Saviano stating: "It is most important for Mr. Champagne's health that he have very regular work hours and a very regular, predictable schedule." Because the note did not explain the nature of Champagne's problems, Thomas called Dr. Saviano for further explanation. Dr. Saviano did not reveal Champagne's condition, but simply repeated that it would be in Champagne's best interest for him to continue driving the set route. On this advice, Thomas asked Champagne's supervisor to leave Champagne on the set route, and the supervisor agreed. Champagne continued to work without incident. Indeed, Champagne's evaluations for 1991 through 1993 show that his performance was exemplary.

In mid–1992, Servistar made managerial changes affecting the Westfield terminal. Phil Hammonds became the new warehouse manager at the Westfield terminal, thus becoming Champagne's new supervisor, and Tom Brennan became Servistar's new Vice President of Operations. Hammonds discovered that drivers at the Westfield terminal were switching routes on their own initiative and that three drivers, including Champagne, were driving set routes. Hammonds, based on the medical information before him, did not believe that Champagne and the other individuals driving set routes suffered from medical disabilities preventing them from complying with the route-rotation requirement.

In early 1993, Brennan and Hammonds reinstated strict route rotation across the board at the Westfield terminal. Routes were organized into groups of four or five routes and drivers were required to rotate within these groups. On June 14, 1993, Champagne produced another short note from Dr. Saviano recommending that Champagne continue to drive a set route. No explanation was given nor was a claim made that Champagne was disabled: "Mr. Champagne requires regular psychotherapy sessions. It is essential that Mr. Champagne's treatment be augmented and supported by a very regular work schedule." On June 17, 1993, Hammonds told Champagne by phone that Champagne would have to meet normal route-rotation requirements or go to work in

the warehouse until he was able to do so. On June 21, 1993, Hammonds sent written notice to all drivers on set routes, including Champagne, that Servistar expected them to drive according to rotating schedules and that, if they were unable to rotate routes within 30 days for medical reasons, they would, as an accommodation, be placed on light duty status and transferred to the warehouse.[1] Transfer to the warehouse would have entailed a loss of pay for Champagne.

Champagne regarded his regular route as an accommodation to his mental condition, and he believed that the notice from Servistar constituted a threatened withdrawal of reasonable accommodation in violation of the ADA. On July 15, 1993, Champagne filed a disability discrimination complaint with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission. He filed a civil action in Massachusetts state court seeking to enjoin Servistar from removing him from his regular route. The state court granted a temporary restraining order against Servistar. Servistar complied with the TRO and, before the hearing on a preliminary injunction, voluntarily agreed to leave Champagne on the set route pending receipt of more specific information on Champagne's condition.

Champagne did not release his medical records to Servistar, apparently on the advice of his attorney. Dr. Saviano, however, responded to Servistar's inquiries about Champagne's condition in a letter dated October 20, 1993. Dr. Saviano informed Servistar that Champagne suffered from anxiety disorders caused by previous emotional injuries, and he reiterated his view that Champagne needed "a fixed regular schedule in which he travels the same route, sees the same people and performs the same activities routinely." Dr. Saviano said that such a schedule would permit Champagne to control his anxieties. "Even changes known well in advance could be very hurtful to his therapy and his well being."

## II

In the meantime, other events were unfolding. In the fall of 1993, two items of information came to Hammonds' attention suggesting that at least some Servistar drivers were falsifying travel logs they are required to keep by the federal Department of Transportation ("DOT"). DOT regulations require interstate truckers to record their driving time, non-driving but on-duty time, and off-duty time.

The first item of information was that a Servistar truck had been observed parked on a residential street for a period of time. Hammonds checked the logs, which indicated the driver had been on duty at the time the truck was parked on the street. Hammonds prepared a recommendation to fire the driver, believing the facts indicated that the driver was basically "stealing" time, and therefore pay.[2] When Hammonds met with the driver, the driver indicated he had "carried over" time from the prior day in order to comply with DOT regulations, but that he put the time in. Hammonds decided not to fire the driver, but still gave the driver a written reprimand for falsifying the logs.

The second item of information was the discovery that Champagne was making excessive use of the company telephone credit card that had been issued to him. Servistar issues phone cards to all drivers and drivers are allowed one fifteen minute call per day.

---

1. Hammonds' memo stated in relevant part:

   You have been given a 30 calendar day notice, beginning June 19, 1993, that you must perform all the essential functions of your truck driving position. Rotation of routes within a scheduled departure group is an essential function of the truck driver position at SERVISTAR.

   If on July 18, 1993, the last day of the 30 day period, your medical restrictions keep you from rotating within a scheduled departure group, SERVISTAR will accommodate you by offering work in the warehouse. This accommodation will continue until your medical condition permits you to perform the expected functions of truck driving. You will be expected to meet productivity requirements within the stockhandler job function. You will be assigned to a work shift and work section were [sic] there is a need. While in the stockhandler position, your rate of pay and hours of pay will be as described in our light duty policy.

2. Servistar drivers are paid on an hourly basis, so an inflated driving log generally indicates the driver has received more pay than actually owed.

Supervisor Jim Atwater noticed that Champagne's phone bill for September 1993 listed more than sixty calls, some lasting more than an hour. Atwater brought the phone bill to Hammonds' attention. Hammonds decided to take no action against Champagne on the excessive phone use. Hammonds also noticed that many of the calls had been made during the middle of the day when Champagne would ordinarily be driving. Hammonds called the number from which Champagne had made these mid-day calls and learned that the source was a Holiday Inn in Ronkonkoma, New York. Hammonds cross-checked the phone records against Champagne's logs. He discovered that Champagne had recorded that he had been driving or was otherwise on-duty during those times when phone records showed he was making calls. By recording more driving time than he had actually performed, Champagne had been paid money he was not properly owed.

Upon learning this, Servistar consulted legal counsel and decided to audit the logs and phone records of all Westfield terminal drivers when the following month's phone records came in, as well as to audit drivers in other locations randomly. Servistar realized that the phone card records gave it a way to test the accuracy of its drivers' logs. The all-driver audit was conducted the following month, in November 1993, on the October 1993 phone bills. It revealed that four drivers, including Champagne, had falsified their DOT logs by recording they were driving at times when phone records showed they were making calls. Servistar did not take immediate action on these individuals, but decided to investigate further to see if a pattern existed. Servistar reaudited the four drivers the following month and discovered that three of the drivers, including Champagne, had multiple violations during that month as well. The fourth driver had only one violation.

Servistar decided to terminate the employment of the three drivers who had multiple violations, including Champagne, and to give a written warning to the fourth driver. Hammonds, Brennan and another supervisor met individually with each of the three drivers who were to be fired. Each was given copies of records and shown the violations.

Champagne did not dispute the evidence. In fact, Champagne said, he had been falsifying his DOT logs for twenty years and he did so because he did not want speeding violations showing in his logs. Champagne said this was common practice among Servistar drivers and something Servistar itself knew about and encouraged. On January 20, 1994, Servistar fired Champagne and the two other drivers.

Since these terminations, Servistar has continued to perform random cross-checks of drivers' logs against their phone bills. In late 1994, Servistar discharged another driver for log violations. In his twenty-five years with Servistar, Brennan has also terminated three other drivers for log violations.

Champagne says that Servistar knew that its drivers routinely violated DOT log regulations, and that the use of such violations to terminate him masks Servistar's real intention to discriminate against him on account of his disability and retaliate for his filing a discrimination charge against the company. Champagne's specific evidence on this point is discussed below.

### III

On January 27, 1995, the EEOC issued Champagne a "Right to Sue" letter. Champagne withdrew his state court action and, on February 21, 1995, filed this federal lawsuit. Champagne alleged that Servistar discriminated against him because he was disabled in violation of 42 U.S.C. § 12112(a), that Servistar fired him in retaliation for his filing a discrimination charge in violation of 42 U.S.C. § 12203(a), and that Servistar had threatened to withdraw his workplace accommodation in violation of 42 U.S.C. § 12203(b). Servistar counterclaimed for damages alleging breach of fiduciary duty, and fraud and deceit.

Servistar moved for summary judgment on Champagne's claims and its counterclaims. The district court granted Servistar's motion as to Champagne's claims, holding that Champagne did not meet the statutory definition of disability, and that his evidence of retaliation or threat was insufficient to overcome Servistar's legitimate and nondiscrimi-

natory explanation. The district court denied summary judgment as to Servistar's counterclaims. Champagne appeals the granting of summary judgment as to his three claims.

## IV

■ The scope of our review over the district court's entry of summary judgment in favor of Servistar is de novo. *See Soileau,* 105 F.3d at 14. Summary judgment is appropriate when the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Champagne says he has suffered harm from two sources: (1) the termination of his employment, which he says resulted from discrimination or retaliation or both, and (2) the memorandum notifying him he would have to return to rotating routes or work in the warehouse, which he says was a threat to withdraw the accommodation Servistar was obligated to grant him.

### A. Termination and Retaliation

■ As to the first harm, the district court carefully parsed Champagne's discrimination and retaliation claims, and concluded that Champagne did not meet the statutory definition of disabled [3] and that his evidence of retaliation was insufficient. We take a shorter route. We have no doubt that Champagne suffered from a mental impairment, a first step toward establishing disability under the ADA. But even if Champagne could establish he was disabled within the

meaning of the ADA, his case on termination fails on the issue of causation. Champagne has not produced evidence from which a finder of fact could reasonably find that Servistar "discharged [him] in whole or in part because of [his] disability," *Equal Employment Opportunity Comm'n v. Amego, Inc.,* 110 F.3d 135, 141 n. 2 (1st Cir.1997),[4] or that there was a "causal connection between [his] discharge and the conduct" of filing an ADA complaint. *Soileau,* 105 F.3d at 16.[5]

■ Servistar has produced considerable proof that Champagne was dismissed because he falsified the DOT log books in violation of company policy and DOT regulations, and thereby obtained unearned pay. This proof comes from Servistar's cross-referencing the phone records against DOT logs for all Westfield terminal drivers, not just Champagne. This audit proved that three drivers, including Champagne, were falsifying their DOT logs on a regular basis. Champagne does not challenge the accuracy of the telephone records demonstrating that Champagne was in the motel room making calls during times he was supposed to be driving, nor does he contest that he falsified his logs. Servistar terminated all three who had multiple violations, not just Champagne. Servistar has fired other drivers since that time for the same violations.

■ This evidence meets Servistar's burden of articulating a legitimate and nondiscriminatory reason for terminating Champagne. Under the *McDonnell Douglas* framework, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the burden shifts back

3. Under the ADA, the term "disability" means:
   (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
   (B) a record of such an impairment; or
   (C) being regarded as having such an impairment.
   42 U.S.C. § 12102(2)

4. To make out a disability discrimination claim under the ADA,
   a plaintiff must prove by a preponderance of the evidence (1) that she was disabled within the meaning of the ADA; (2) that, with or without reasonable accommodation, she was able to perform the essential functions of her job (in other words, that she was "qualified");

and (3) that the employer discharged her in whole or in part because of her disability. *Amego,* 110 F.3d at 141 n. 2

5. To make out a retaliation claim under the ADA, *see* 42 U.S.C. § 12203(a), Champagne must "show that he was engaged in protected conduct, that he was discharged, and that there was a causal connection between the discharge and the conduct." *Soileau,* 105 F.3d at 16. We have no doubt that Champagne makes out a prima facie case of retaliatory firing. At issue is whether Champagne's evidence permits a fact finder to conclude that the articulated reason is pretextual.

to Champagne to show that Servistar's proffered reason is a pretext for discrimination based on disability, *see Mesnick v. General Elec. Co.,* 950 F.2d 816, 823–24 (1st Cir.1991), or for retaliation, *see id.* at 827–28. To make this showing, "[i]t is not enough for [Champagne] merely to impugn the veracity of [Servistar's] justification; he must elucidate specific facts which would enable a jury to find the reason given is not only a sham, but a sham intended to cover up the employer's real motive." *Id.* at 824 (internal quotation marks and citation omitted).

■ Champagne's response is twofold. His first argument is that consideration of the larger context of events compels the conclusion that he was terminated because of discrimination or retaliation. His second argument is that the alleged misconduct for which he was fired was something which all Servistar drivers did, not just Champagne. As to context, Champagne notes that he was terminated only six months after he filed his discrimination complaint, despite years of good performance evaluations.[6] Moreover, he says, the June 21 memo requiring all drivers to rotate routes, after Servistar had for years allowed him to drive a set route, shows discriminatory animus. As to his misconduct, Champagne provided an affidavit from a fellow driver, Jerry Gilbert, that "[t]he actions of Phillip Champagne of logging time which alleges drive time logged in longer than the time actually driven, was a common practice within the ranks of Servistar's truck drivers, and this fact was known by the supervisors of the truck drivers prior to Champagne's termination."

The Gilbert affidavit is Champagne's strongest evidence, but it does not suffice, either alone or with the context evidence, to permit a reasonable inference that Champagne's firing was motivated by discrimination and retaliation. Accepting as true that historically some Servistar drivers falsified logs, it is undisputed that the two new managers of the Westfield terminal decided to do

something about the problem when it was brought to their attention. The test these managers devised to determine if there had been falsification of records—comparing phone records with driving logs—was plainly neutral. It is undisputed that this test was applied equally to everyone. It is undisputed that the test turned up four offenders, including Champagne, that the employer applied the same test equally to each of these four for a second month to determine if there was a pattern, and that when the second test showed three of the four had repeatedly falsified their logs, including Champagne, they were treated equally: each had his employment terminated. And it is undisputed that Servistar has continued to cross-reference phone records against driving logs on a random basis and terminate those who the test shows falsified the log. No inference of discrimination or retaliation may reasonably be drawn from these facts. That others may have turned up clean on the test although they had falsified logs, or that others in the past had falsified logs but not been caught, adds nothing to Champagne's case.[7] More specifically, Champagne produced no evidence that audits were conducted in the past or that the company retained drivers who were shown by an audit to have repeatedly falsified records.

The contextual evidence offered to show Servistar's *motive* to discriminate or retaliate against Champagne is also insufficient, and in any event cannot overcome the fact that Champagne was treated no differently than his fellow drivers. Given the absence of differential treatment, the district court properly concluded that Champagne had failed to produce evidence of causation sufficient to survive summary judgment.

### B. Threatened withdrawal

Champagne finally claims that Servistar unlawfully threatened his enjoyment of a reasonable accommodation under the ADA when

---

6. We do not reach the issue, urged by Servistar, that plaintiff's original charge of discrimination filed with the EEOC did not go to the termination of his employment and that plaintiff never attempted to amend the charge to include his termination and retaliation claims.

7. Similarly, that Champagne may have had reason to falsify his times does not, as he argues, show he was treated differently in the termination of his employment.

he filed a disability discrimination charge with MCAD and EEOC on July 15, 1993. The threat, he claims, came in the form of the June 21 memorandum. That memo stated that Champagne, along with all others driving a set route, would be required to drive rotating routes thirty days from the date of the memo. The memo explained: "[Y]ou must perform all the essential functions of your truck driving position. Rotation of routes within a scheduled departure group is an essential function of the truck driver position at SERVISTAR." The memo further explained that Champagne would be reassigned to light duty in the warehouse if "medical restrictions keep you from rotation within a scheduled departure group.... This accommodation will continue until your medical condition permits you to perform the essential functions of truck driving."

■ On the evidence, Champagne's claim does not survive. He relies on part of the ADA's anti-retaliation statute, 42 U.S.C. § 12203(b):

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

It is doubtful Champagne has shown that he had "exercised a right granted or protected by the ADA." Before he filed his EEOC complaint, Champagne had not asserted he was disabled within the meaning of the ADA. He certainly never provided Servistar with any medical evidence from which a conclusion of disability, as defined in the ADA, was warranted. That Servistar voluntarily decided to permit Champagne to avoid route-rotation for a period of time does not establish that Champagne was disabled or that avoidance of route-rotation was a required reasonable accommodation.

■ In this context, like the district court, we do not think the memorandum may be reasonably viewed as a threat or interference under § 12203(b). Under the ADA, Servistar has substantial leeway in defining the essential functions of its truck driving positions, and it may require its drivers to be able to perform those functions. *See* 42 U.S.C. § 12111(8).[8] It is true that other Servistar managers had not enforced the route-rotation policy strictly or cross-checked phone records against DOT logs in the past. But that does not permit the conclusion that the decision by new managers to enforce company policy, and to audit for non-compliance, is a threat or interference with ADA rights. We stress that the decision of new managers to enforce the policy was applied uniformly. The district court properly granted summary judgment in favor of Servistar on this claim.

The decision of the district court is *affirmed.* Costs are awarded to the defendant.

8. 42 U.S.C. § 12111(8) provides in relevant part: The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the em-

ployment position that such individual holds or desires. For the purposes of this title, consideration shall be given to the employer's judgment as to what functions of a job are essential....