**Ronald Jeffrey KIPHART**

v.

**SATURN CORPORATION, et al.**

No. 1–97–0054.

United States District Court,
M.D. Tennessee,
Nashville Division.

Sept. 30, 1999.

Mary Ann Parker, Brenda Rhoton Little, Parker & Crofford, Nashville, TN, James E. Goodman, Goodman & Associates, P.C., Atlanta, GA, Michael E. Terry, Stephanie H. Gore, Nashville, TN, for Plaintiff.

Robert Earl Boston, Waverly David Crenshaw, Jr., Stephen W. Grace, Thomas H. Lee, Mark W. Peters, Waller, Lansden, Dortch & Davis, Nashville, TN, G. Geoffrey Weirich, Susan E. Himmer, Paul, Hastings Janofsky & Walker, Atlanta, GA, Alice M. Osburn, Saturn Corp., Detroit, MI, Connye Harper, Detroit, MI, Michael Hamilton, Lee D. Anderson, Provost, Umphrey Law Firm, LLP, Nashville, TN, for Defendants.

## *MEMORANDUM*

HIGGINS, District Judge.

The plaintiff, Ronald Jeffrey Kiphart, is one of the original 77 plaintiffs who brought this action against Saturn Corporation; International Union, United Auto, Aerospace and Agricultural Implement Workers of America; and Local 1853 International Union, United Auto, Aerospace and Agricultural Implement Workers of America, alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and more than twenty other federal and state law claims. By

voluntary dismissal and agreed order, 18 plaintiffs have been dismissed from this action and all claims, except the ADA claims, have been dismissed by the remaining 59 plaintiffs.[1] *See* orders (entered October 8, 1997 and March 2, 1998; Docket Entry Nos. 34 and 184).

At the pretrial conference on February 8, 1999, the Court determined to try the ADA claims of a single pilot plaintiff to expedite the disposition of the claims of the remaining plaintiffs.[2] Mr. Kiphart was chosen, and the only claim of Mr. Kiphart against the defendants remaining for trial was his ADA claim for failure to reasonably accommodate his alleged disabilities.

The trial of this pilot plaintiff commenced on March 8, 1999. At the close of the plaintiff's proof, the Court granted the Rule 50 motion of the UAW International Union on the grounds that the International Union was not a joint employer, and the International Union was dismissed from this action. At the close of all the evidence, Saturn and Local 1853 moved for judgment as a matter of law. Local 1853's motion was granted and it was dismissed from this action, while Saturn's[3] motion was taken under advisement.

## I.

Mr. Kiphart is 46 years old and has been an employee of General Motors for 28 years. In 1990, Mr. Kiphart moved to Tennessee where he began work as an operating technician at Saturn. Saturn is an automobile manufacturing plant located in Spring Hill, Tennessee, which employs over 7,000 employees.

Mr. Kiphart claims that from April 18, 1992, through November 22, 1996, he was disabled within the meaning of the ADA. Specifically, the plaintiff alleges that he had tendinitis, bilateral chronic ulnar neuropathy, a fused cervical spine at the C6–C7 level, and chronic depression, and that these conditions substantially limited one or more of his major life activities. The plaintiff alleges that he was incapable of performing certain manual tasks, was restricted from lifting more than thirty pounds, and that his ability to think, concentrate, interact with others, and sleep were substantially impaired. The plaintiff further alleges that, even if he was not disabled within the meaning of the ADA because his physical and mental impairments did not substantially limit one of his major life activities, he was nevertheless disabled within the meaning of the ADA because he had a record of such an impairment or the defendant perceived him as so impaired.

Mr. Kiphart alleges that, despite the fact that his physical and mental impairments substantially limited his major life activities during the time in question, he was qualified to perform the essential functions of his job, with or without an accommodation. He also asserts that he sought an accommodation from Saturn by requesting that he be permanently placed on a team where he could be fully functional and fully rotational.[4] Mr. Kiphart contends that instead of accommodating his disability by giving him a permanent place-

1. These claims were re-filed in the state court and have reappeared in this Court in forty-eight (48) separate cases by virtue of removal based upon diversity of citizenship and the amount in controversy. These cases are being held in abeyance pending the final outcome of the *Kiphart* case.

2. It was essentially agreed that the entry of a final judgment in Mr. Kiphart's case and the outcome of an appeal would more than likely lead to the resolution of the claims of the remaining plaintiffs.

3. The jury found for Mr. Kiphart and against Saturn, on Mr. Kiphart's ADA claim for failure to reasonably accommodate his disability.

4. The fully functional/fully rotational team concept used by Saturn is a system by which teams are set up to perform functions in relation to the production of Saturn automobiles. To be a permanent member on a team, the employee must be able to perform every job of that team. This system was established partly to prevent injuries due to the repetition of a single movement or activity.

ment on a team, Saturn gave him temporary positions and then, from April 18, 1996, through November 22, 1996,[5] placed him on involuntary leave, both on the basis of his disability in violation of the ADA.[6]

Saturn concedes that during the relevant period Mr. Kiphart had a physical impairment but denies that he was disabled within the meaning of the ADA, either because of his impairment, because he had a record of an impairment, or because he was regarded as having an impairment. Saturn asserts that, even if Mr. Kiphart was disabled within the meaning of the ADA, he was not an otherwise qualified person with a disability within the meaning of the Act because he was unable to perform the essential functions of his job with or without a reasonable accommodation. Specifically, Saturn asserts that an essential function of Mr. Kiphart's position was that he be fully functional and fully rotational and that because he was not, he was not an otherwise qualified person with a disability within the meaning of the Act.

Saturn also asserts that, even if Mr. Kiphart was an otherwise qualified disabled person within the meaning of the ADA, it provided him with a reasonable accommodation by placing him in Saturn's Member Placement Program. Through this program, Saturn provided Mr. Kiphart with temporary assignments and extended leave with disability benefits.

For the reasons stated below, Saturn's motion for judgment as a matter of law will be granted.

## II.

In determining whether to grant Saturn's motion for judgment as a matter of law, the Court determines whether the record contains evidence sufficient to permit a reasonable jury to find in favor of Mr. Kiphart. *Monday v. Oullette,* 118 F.3d 1099, 1101–02 (6th Cir.1997). The Court views the evidence in a light most favorable to Mr. Kiphart and gives him the benefit of all reasonable inferences. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1081 (6th Cir.1994); *Smith Corona Corp. v. Pelikan, Inc.,* 784 F.Supp. 452, 460–61 (M.D.Tenn.1992).

The issue to be determined is "whether there is sufficient evidence to raise a question of fact for the jury. The trial court may neither weigh the evidence, pass on the credibility of the witnesses nor substitute its judgment for that of the jury." *Smith Corona,* 784 F.Supp. at 461. A Rule 50 motion is to be granted if "the evidence is uncontradicted and a reasonable mind could only draw one conclusion from the evidence." *Id.* The Court applies this standard in reaching its conclusions herein.

## III.

Under the ADA, employers may not discriminate "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA definition of the term " 'discriminate' includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity.' " *Smith v. Ameritech,* 129 F.3d 857, 866 (6th

---

**5.** On November 22, 1996, Mr. Kiphart was successfully placed in a permanent position on a team, and he has maintained this position until the present time.

**6.** During an in-chambers conference preceding the trial of this action, the parties agreed that Mr. Kiphart was time-barred from bringing claims based on what occurred more than 300 days before filing suit. Second pretrial order (Docket Entry No. 374).

Cir.1997) (quoting 42 U.S.C. § 12112(b)(5)).

Mr. Kiphart's ADA claim is based on his assertion that Saturn failed to reasonably accommodate his disability. In order to demonstrate a prima facie case of disability discrimination under this claim, a plaintiff must establish that during the relevant time period: (1) he was disabled within the meaning of the ADA; (2) he was qualified to perform the essential functions of his job with or without reasonable accommodations; and (3) Saturn either refused to make a reasonable accommodation for his disability or took an adverse employment action against him based solely upon his disability. *Ameritech*, 129 F.3d at 866 (citing *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir.1996)); *see also, McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir.1997).

### A. *Disability*

◼ The ADA provides three definitions of disability: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). A plaintiff's subjective belief that he is "disabled" is insufficient as a matter of law to entitle him to protection under the ADA. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir.1992) (holding that rumors, conclusory allegations, and subjective beliefs are insufficient to support a discrimination claim). Similarly, injuries or workplace restrictions are not, without more, "disabilities" under the ADA. *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir.1997); *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 n. 2 (5th Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997).

In *Bragdon v. Abbott*, 524 U.S. 624, ——, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540, 553 (1998), the Supreme Court of the United States set forth a three-prong test for determining whether a plaintiff has a physical or mental impairment that substantially limits one or more major life activities. The first consideration is whether each of the plaintiff's asserted ailments constitutes a physical or mental impairment. *Id.* The second consideration is whether the life activities upon which the plaintiff relies constitute major life activities under the ADA. *Id.* The third consideration is whether the impairments substantially limited the asserted major life activities during the relevant period of time. *Id.*[7]

7. Mr. Kiphart primarily worked in traditional GM facilities from 1971 until October, 1990, when he began his employment as a Saturn team member. Since December, 1991, Mr. Kiphart has had tendinitis, also known as "tennis elbow," and ulnar neuropathy in his arms. He also had cervical disc surgery in October, 1995, to relieve symptoms caused by two fused discs. Due to these injuries, doctors have restricted the types of tasks Mr. Kiphart can physically perform. As a result of his arm injuries, doctors instructed Mr. Kiphart to avoid hand power tools, repetitive, frequent twisting of his arms and elbows, flexing his wrists, and lifting more than 20 pounds. As a result of his neck injuries, doctors instructed him to avoid turning his head more than ten times per minute, and repetitively bending his neck, but increased the amount he could lift at that time to 30 pounds. Transcript (Docket Entry No. 421) vol. II at 157, 141–42 (Kiphart).

Mr. Kiphart also asserts a mental disability of chronic depression which he alleges substantially limits his ability to work and sleep.

Mr. Kiphart testified that his asserted impairments affected his ability to roof houses, participate in recreational activities, drive for long periods of time, sleep, socialize, do yard work, mow the grass, clean vinyl siding, paint his home, wash his car, and work. Further, Mr. Kiphart testified that, as a result of his injuries, he could not perform several of the jobs that he held prior to joining Saturn in 1990: one at a tomato cannery, one at an auto parts factory in Michigan, one at a KMart retail outlet, and at two General Motors Delco–Remy plants and one Buick Oldsmobile Cadillac plant. Mr. Kiphart also testified that he could not perform his former position on Saturn's door panel install team. *Id.* at 205–10 (Kiphart); Transcript (Docket Entry No. 420, 421) vols. I & II at 71, 200–210 (Kiphart).

An "impairment" under the ADA is "(1) [a]ny physiological disorder, or condition ... affecting one or more of the following body systems: neurological; musculoskeletal, ... or (2)[a]ny mental or psychological disorder, such as ... emotional or mental illness, ..." 29 C.F.R. § 1630.2(h)(1) and (2).

Mr. Kiphart alleged that he had bilateral chronic ulnar neuropathy, tendinitis, a fused cervical spine at the C6–C7 level, and chronic depression. These ailments can amount to physical or mental impairments under certain factual scenarios under the ADA. Accordingly, the Court will assume, without deciding, that a reasonable trier of fact could conclude that Mr. Kiphart's ailments were impairments under the ADA.

■■■ The EEOC has identified several major life activities in its regulations and interpretive guidelines. These include "such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working*." 29 C.F.R. § 1630.2(i) (emphasis added). Moreover, sleep, though not one of the enumerated major life activities under the regulations, is a major life activity. *See Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999). Therefore, the Court concludes that the only activities alleged by Mr. Kiphart that could qualify as major life activities are his ability to sleep and work.[8] Accordingly, for the Court to warrant submission of the case for the jury's determination that Mr. Kiphart was disabled under the ADA, there must be evidence in the record sufficient to permit a reasonable fact finder to conclude that Mr. Kiphart's asserted impairments substantially limited his ability to sleep or work. *Monday,* 118 F.3d at 1101–02; *Bragdon,* 524 U.S. at ——, 118 S.Ct. at 2202, 141 L.Ed.2d at 553; 42 U.S.C. § 12102.

The EEOC regulations pertaining to the ADA define the term "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). In determining whether an individual is substantially limited in a major life activity, consideration is to be given to the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *see also, Penny v. United Parcel Serv.,* 128 F.3d 408, 414–15 (6th Cir.1997) (applying factors).

■■■ Evidence of mere work restrictions or descriptions of ailments will not satisfy the plaintiff's burden of establishing a substantial limitation. *Snow,* 128 F.3d at 1207 (refusing to assume that a general lifting restriction constitutes a disability); *see also, Jasany v. United States Postal Service,* 755 F.2d 1244, 1249–50 (6th Cir. 1985) (restriction from letter sorting does not substantially limit the plaintiff's ability to work because the plaintiff could perform other duties at the post office). The determination of whether an individual is substantially limited in the ability to perform a major life activity is not based on the name or diagnosis of the person's impairment, but is based on the "effect of that impairment on the major life activities of the individual." 29 C.F.R. 1630.2(j), App.

---

**8.** *See Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 641 (2d Cir.1998) (holding that working on cars, doing yard work, painting, and driving long distances are not major life activities under the ADA), *cert. denied,* —— U.S. ——, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999).

With respect to sleeping, taking medication and stating that "I usually get a tough night's sleep" is not enough to meet the "substantial" requirement,. as "[d]ifficulty sleeping is extremely widespread." *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 644 (2nd Cir.1998). Instead, there must have been a showing that the plaintiff's affliction is worse than that "suffered by a large portion of the nation's adult population." *Id.; see also, Pack*, 166 F.3d at 1306; EEOC Guidance on Psychiatric Disabilities and the ADA, EEOC Compliance Manual (BNA) No. 59 at E–2 n. 16 (March 27, 1997) (App. Vol. 11 at 532) ("Sleeping is not substantially limited just because an individual has some trouble getting to sleep or occasionally sleeps fitfully.").

Neither Mr. Kiphart,[9] nor his physicians who testified at trial, Robert Bain [10] and Frederick Wade,[11] nor any expert witness, presented more than general conclusory statements concerning Mr. Kiphart's periodic insomnia and need to take naps during the day. Accordingly, the Court concludes that Mr. Kiphart presented no evidence from which a reasonable fact finder could conclude that his alleged sleeping difficulties during the relevant time were any different from those experienced by an average person in the general population. Because there is no such evidence in the record, the Court concludes that no reasonable fact finder could find that Mr. Kiphart's asserted impairments substantially limited his ability to sleep. *Monday*, 118 F.3d at 1101–02.

With respect to the plaintiff's burden when the major life activity alleged to be significantly limited is work, the Sixth Circuit has held that:

[i]n order for [a plaintiff] to establish that [he] is substantially limited in the major activity of working, [the plaintiff] must prove that he is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a singular particular job does not constitute a substantial limitation in the major life activity of working.

*McKay*, 110 F.3d at 371 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).[12]

"The ADA standard of a class or broad range of jobs, is not easily met; ...." *Vaughan v. Harvard Indus., Inc.*, 926 F.Supp. 1340, 1347 (W.D.Tenn.1996), *overruled on other grounds, Bratten v. SSI Services, Inc.*, 185 F.3d 625, 635 (6th Cir. 1999). The regulations set forth the following additional factors which may be considered with respect to whether the plaintiff is substantially impaired in the activity of working:

(A) The geographical area to which the individual has reasonable access;

9. *See* transcript (Docket Entry No. 421) vol. II at 212–218.

10. *See* transcript (Docket Entry No. 421) vol. II at 333–347. Dr. Bain is family practitioner with offices in Columbia and Mt. Pleasant, Tennessee, and has treated Mr. Kiphart for depression, among other ailments, including tendinitis, since 1992. *Id.* at 316–17, 325. Dr. Bain also referred Mr. Kiphart to Dr. Rodney Poling, a psychiatrist, for depression. *Id.* at 324. Dr. Poling did not testify at trial.

11. Dr. Wade is an orthopedic surgeon who practices in Columbia, Tennessee, and was the treating physician for Mr. Kiphart's cervical disk injury. *See* transcript (Docket Entry No. 422) vol. III at 397–400. Dr. Wade also discussed at trial Mr. Kiphart's tendinitis and ulnar neuropathy, and the medical records of Dr. Moore, one of his partners who treated Mr. Kiphart's elbow injury. *Id.* at 403–408, 415. Neither physician dealt with Mr. Kiphart's depression or sleeping problem.

12. Additionally, the Seventh Circuit has held that " 'an inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work; rather, 'the impairment must substantially limit employment generally.' " *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir.1996) (quoting *Byrne v. Board of Educ. Sch. of West Allis–West Milwaukee*, 979 F.2d 560, 565 (7th Cir.1992) (citation omitted)).

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(3)(ii).[13]

■ At trial, Mr. Kiphart offered only his own conclusory statements that he cannot perform some specific jobs he held prior to joining Saturn. Such testimony fails to address the geographical area to which he had access, the class of jobs, or broad range of jobs from which he was disqualified. Moreover, Mr. Kiphart admitted that there are numerous jobs for which he could perform all of the essential functions.[14] Mr. Kiphart's admission undermines any claim that he is substantially limited in the major life activity of working because it is direct evidence that he has the capability to perform such jobs. *See Jasany*, 755 F.2d at 1250.

Indeed, the vocational evidence presented supports a finding that Mr. Kiphart is not disabled. Saturn's expert, Patsy Bramlett, identified a vast number of jobs in Middle Tennessee that came within Mr. Kiphart's skills and abilities. Defendant's Exh. 31; transcript (Docket Entry No. 425) vol. VI at 1248–59 (Bramlett).

The evidence before the Court, therefore, does not permit a reasonable fact finder to conclude that Mr. Kiphart was significantly restricted in his ability to perform either a class of jobs or a broad range of jobs. *Monday*, 118 F.3d at 1101–02; *see also, Wainscott v. Medusa Aggregates Co.*, 173 F.3d 857, No. 98–5562, 1999 WL 196561, at *9 (6th Cir. Apr.1, 1999) (affirming summary judgment for an employer because the employee's inability to perform 18,000 of the 110,00 jobs identified that he could perform before his injury indicated that he was restricted in only a narrow range of jobs).

■ Similarly, the Court concludes that Mr. Kiphart had no "record" of a disability. To satisfy this prong, "[t]he impairment indicated in the record must be an impairment that would substantially limit one or more the individual's major life activities." 29 C.F.R. § 1630.2(k); *Curry v. Empire Berol*, 134 F.3d 370, No. 97–5012, 1998 WL 13407, at *3 (6th Cir. Jan.7, 1998). In light of the Court's finding that the plaintiff's impairments did not substantially limit any major life activity, including sleeping or working, the Court concludes that no reasonable fact finder could conclude that Mr. Kiphart has a record of an impairment that would have substantially limited one or more major life activities during the relevant period.

---

**13.** These factors are to be considered in addition to "(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and the permanent or long term impact, and (iii) the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

**14.** These are positions at Saturn which include an administrative position, a "quality job in car final," a "data entry job in car final," a position on the electrical check team of the car final module, a position on the "squeak and rattle" team in the car final module, a position on the door-kiting team in the vehicle interior systems module, a position on the roof applique and lock pillar team, a position on the polymers GTX team, a "[team] in the body systems area that was called motor compartment B," and that he has performed all the tasks required in the steel blankers team since November 22, 1996. Transcript (Docket Entry Nos. 420 and 421) vols. I and II at 133, 144, 238, 99, 133, 144–46, 172–83 (Kiphart); plaintiff's Exh. 3.

Additionally, Mr. Kiphart contended at trial that Saturn "regarded" him as disabled because it took him off a permanent position and put him on a series of temporary assignments. and reassignments and placed him on medical leave during the relevant period.

There are three ways in which a plaintiff may establish that he was "regarded as" having a disability:

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer ... as constituting a substantially limiting impairment;

(2) the individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) the individual may have no impairment at all but is regarded by the employer ... as having a substantially limiting impairment.

*Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 884–85 (6th Cir.1996) (quoting 29 C.F.R. § 1630.2(1)).

■■■ An employer does "not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job." *Id.* at 885. Nor does an employer's provision of temporary duty to an "impaired" employee necessarily give rise to an ADA "regarded as" claim. *Soileau v. Guilford of Maine, Inc.,* 928 F.Supp. 37, 51 (D.Maine 1996), *aff'd,* 105 F.3d 12 (1st Cir.1997). Rather, a plaintiff must prove both that his employer was aware of his asserted impairment, and that it regarded him as foreclosed, not just from working a particular job, but from an entire class of jobs or a broad range of jobs across various classes. *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996); *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 192 (5th Cir.1996); *Wooten v. Farmland Foods,* 58 F.3d 382, 386 (8th Cir.1995).

The Court finds that Saturn's provision of temporary assignments and reassignment is not evidence that Saturn regarded Mr. Kiphart as impaired or disabled. To the contrary, Saturn's inclusion of Mr. Kiphart in the MPP and its provision of temporary assignments demonstrate that Saturn believed Mr. Kiphart to be qualified for other positions. *See Sherrod v. American Airlines,* 132 F.3d 1112, 1121 (5th Cir.1998) (finding that based on an employer's attempt to place a plaintiff in other positions for which the employer did not consider the plaintiff disqualified based on her impairment, a reasonable jury could only conclude that the employer did not regard her as disabled).

■■■ Mr. Kiphart also attempted to satisfy the "regarded as" definition by asserting that Saturn's provision of medical leave to him was proof that Saturn regarded him as disabled. This argument is unavailing. If accepted, it would "discourage employers from taking such preliminary or temporary steps ... for fear that showing concern for an employee's alleged medical problems could draw them into court." *Mobley v. Board of Regents of Univ. Sys. of Georgia,* 924 F.Supp. 1179, 1189 (S.D.Ga.1996).

■■■ The Court finds that the plaintiff presented no evidence from which a reasonable fact finder could conclude that Saturn regarded him as disabled and disqualified from a broad range of jobs. Indeed, the Court concludes, as a matter of law, that Saturn's undisputed provision of lengthy and numerous temporary assignments is proof that Saturn did not regard Mr. Kiphart as disabled. *Monday,* 118 F.3d at 1101–02.

Accordingly, from all the evidence and construing every inference from the trial record in Mr. Kiphart's favor, the Court concludes that no reasonable fact finder could find Mr. Kiphart "disabled" as that term is defined by the ADA. *Id.*

## B. Qualified Individual with a Disability

In order to establish that he is an otherwise qualified individual within the meaning of the ADA, a plaintiff must prove that he can perform the essential functions of the position "with or without a reasonable accommodation." 42 U.S.C. § 12111(8).

The essential functions are defined by the regulations as "the fundamental job duties of the employment position the individual with a disability holds...." 29 C.F.R. § 1630.2(n)(1). The focus of the inquiry is directed to "whether removing the function would fundamentally alter the position." 29 C.F.R. § 1630.2(n), App. The Act provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); see also, 29 C.F.R. § 1630.2(n)(3)(i); Webster v. Methodist Oc-cupational Health Centers, Inc., 141 F.3d 1236, 1238 (7th Cir.1998); EEOC v. Amego, Inc., 110 F.3d 135, 145 (1st Cir.1997). In addition to these two factors, the regulations also provide that the amount of time on the job devoted to performing the function, the consequences of not requiring the employee to perform the function, the terms in a relevant labor agreement, the work experience of those who have held the position in the past, and the current work experience of those who hold similar jobs are also non-exclusive factors which may be weighed in determining essentialness. Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 849 (6th cir.1998) (quoting 29 C.F.R. § 1630.2(n)(3)).

■ At trial, Saturn maintained that task rotation is an essential function of operating technicians such as Mr. Kiphart. The evidence is undisputed that during the relevant period the employees of Saturn, including Mr. Kiphart, considered task rotation to be an essential function.[15] The evidence also reflects that Saturn and the

---

15. First, Mr. Kiphart himself admitted that he always knew, and that Saturn always had informed him, that task rotation was essential to his job as a Saturn operating technician and that, after his injury in 1992, he could not perform that essential function on his assigned door panel team:

Q: Mr. Kiphart, it's true that in October of 1990 when you first came to Saturn you understood that as an operating technician on the Saturn car-making line you needed to be fully functional and fully rotational. Isn't that right?

A: The words fully functional/fully rotational weren't used. I was told that when I came to Saturn that I would have to learn all the job functions on a particular team and rotate through them.

Q: And that concept is also known as task rotation, isn't it?

A: I believe so.

Q: And at your deposition when I used the term fully functional and fully rotational, you told me in October of 1990 you understood from that point forward that you needed to be fully functional and fully rotational.

A: Yes, I did.

Transcript (Docket Entry No. 421) vol. II at 226 (Kiphart).

Q: And why were you taken off the door panel install team?

A: Because we were told that we had to not only know every job in that team, we had to rotate on every job of that team. And I was unable to do the screw—the screw part of the job, putting the door panels on, so I was taken off the team.

Transcript (Docket Entry No. 420) vol. I at 71 (Kiphart).

Q: Did you have an understanding between 1992 and 1996 as to whether or not you had to be able to rotate through each and every job function on a team before you would be placed on that team permanently?

A: Yes. You had to be able to rotate on every job within the team.

Id. 174 (Kiphart).

Second, many of his trial witnesses, including Gary Goforth, Judy Halter, Jeep Williams, Shirley Roberts, and Darla Gall Farmiloe, all longtime Saturn team members, admitted they, too, had known of the task rotation requirement since, or before, their employment began. See transcript (Docket Entry Nos. 422 and 423) vols. III and IV at 481, 663–64, 684, 693–95, 710–11 and 779.

UAW repeatedly documented Saturn's job task rotation requirement in the original Phase II Document,[16] in a 1995 Manufacturing Action Council joint directive issued to all Saturn team members, and in their collective bargaining agreements, including the 1990, 1994, 1996, and 1997 memoranda of agreement, and the 1997 guiding principles.

Nevertheless, Mr. Kiphart contended at trial that the job task rotation policy was nullified because it was not strictly adhered to, even by management.

■ Whether the employer requires the employees in a particular position to perform a function may indicate whether the function is essential. *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 674 (7th Cir.1998) (citations omitted). However, an essential function does not lose its essential character if the employer fails to adhere to that requirement in all cases. *Brickers*, 145 F.3d at 850. Moreover, several circuits, including the Sixth Circuit, have held, on similar proof, that task rotation is an essential function. *See, e.g., Ison v. Lakeland Reg'l Health Sys.*, 149 F.3d 1183, No. 97–1222, 1998 WL 344033, at *8–9 (6th Cir. May 28, 1998); *Champagne*, 138

F.3d 7 at 14; *Laurin v. Providence Hospital*, 150 F.3d, 52 57–58 (1st Cir.1998); *Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 485 (7th Cir.1997); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir.1996).

Therefore, the fact that there have been occasional periods at Saturn when teams have been relieved of the requirement to rotate tasks does not affect the determination that task rotation is an essential function of a Saturn operating technician's job. As a matter of law, these temporary "exceptions" do not abrogate the rule of task rotation.

Likewise, the Court concludes that "willful violations" of the job task rotation policy by individual team members did not abrogate the policy, particularly where Saturn took reasonable steps to enforce the rotation requirement.[17] Moreover, a number of Mr. Kiphart's witnesses recounted stories of team members apparently choosing, on their own, to ignore Saturn's rotation requirement, no such witness testified that Saturn's policy required anything less than full rotation, and each witness who was asked admitted that he or she knew Saturn had always re-

16. The Group of 99 was set up by GM and UAW leaders to determine the economic and competitive feasibility of small car manufacturing in the United States. This group recommended drastic changes in the way that GM integrated people, technology, and systems in the manufacture of small cars and memorialized its findings in an October 1984 document entitled "Concepts of the Saturn Organization," also known as the "Phase II Document," which became the basis for the creation of the Saturn Corporation.

17. Mr. Anthony James Alferio has worked for Saturn since 1988 in various capacities, and testified about his own enforcement efforts in response to three incidents of teams that failed to rotate. *See* transcript (Docket Entry No. 424) vol. V at 990–991 (Alferio). In 1990, two teams in Saturn's trim department chose not to rotate. Mr. Alferio's undisputed testimony is that he coached and counseled the teams involved to encourage them to follow the rotation policy. *Id.* at 1015–16 (Alferio).

Mr. Alferio also testified that in 1990–91, three teams in Saturn's hardware department refused to rotate and in 1995–96, teams in the doors department did not wish to rotate. He coached and counseled those team members and their leaders in accordance with the consultation process.

Further, Mr. Alferio testified that he held numerous meetings with supervisors and coordinators at virtually every level to remind them of Saturn's requirement that team members rotate through all their assigned job tasks. *Id.* at 1020–21 (Alferio). Tony Kemplin admitted he attended such a meeting when a memorandum, stating Saturn's task rotation requirement, was discussed. Beyond such memoranda and meetings, plaintiffs own witnesses, including Mr. Kemplin and Judy Halter testified that Saturn reasonably could do little more to enforce the policy. Mr. Kemplin testified that "You'd have to hire an extra several thousand people across the site to make sure that was happening." Transcript (Docket Entry No. 422) vol. III at 549 (Kemplin).

quired full task rotation. Evidence was also presented that Saturn took reasonable enforcement steps, including coaching and counseling of teams and leadership, and distribution of written directives, to require teams to comply with the task rotation policy.

Based upon the record, the Court concludes, as a matter of law, that a reasonable fact finder must conclude that job task rotation is an essential function of an operating technician's job. As Mr. Kiphart was unable to perform this function, the Court further concludes that no reasonable fact finder could find that Mr. Kiphart is a "qualified individual with a disability" under the ADA. *Monday,* 118 F.3d at 1101–02.

### C. *Reasonable Accommodation*

Mr. Kiphart claimed at trial that Saturn failed to accommodate him because during the relevant period of time, instead of placing him permanently on a team, it placed him in temporary positions and on medical leave.

■■■ Saturn was not obligated to provide Mr. Kiphart the accommodation he preferred, but only to provide a "reasonable accommodation" based on its own discretion. *Keever v. City of Middletown,* 145 F.3d 809, 813 (6th Cir.1998); *Miranda v. Wisconsin Power & Light Co.,* 91 F.3d 1011, 1016 (7th Cir.1996) (finding that the "ADA does not obligate an employer to provide a disabled employee every accommodation on his wish list."). Moreover, "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead

provided." *Keever,* 145 F.3d at 812 (citations omitted).

Title 42 U.S.C. § 12111(9)(B) provides that the term reasonable accommodation may include:

(B) job structuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

The EEOC regulations explain that an employer "should reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a *reasonable amount of time,*" which "should be determined in light of the totality of the circumstances." 29 C.F.R. § 1630.2(*o*), App. (emphasis added).

■■■ The Sixth Circuit has held that unsuccessful reassignment searches lasting 37 and 40 days amounted to reasonable accommodations. *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173 (6th Cir. 1996); *Ameritech,* 129 F.3d at 866. The Court explained that "employers simply are not required to keep an employee on staff indefinitely in the hope that some position may become available some time in the future." *Monette,* 90 F.3d at 1187. In addition to reassignment, paid and unpaid medical leave are also considered reasonable accommodations. *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 782 (6th Cir.1998).

■■■ In order to accommodate Mr. Kiphart, Saturn placed him in the MMP.[18]

---

18. Step One of the MPP occurs during the first 30 days after a physician places work restrictions upon a team member. At Step One, the goal is to re-assimilate the injured or restricted team member into his or her team's rotation within 30 days. Transcript (Docket Entry No. 426) vol. VII at 1320–1324 & 1335 (McQuirter); defendant's Exh. 10 at 21; defendant's Exh. 11 at 22.

If, however, the team member is not fully functional and fully rotational on his or her team within 30 days, the team member progresses to Step Two of the MPP. At Step Two, as at Step One, the goal remains accommodation by re-assimilation. At Step Two, however, the process expands from the member's team to his or her department or, as it is known at Saturn, the "module," a module being a grouping of several teams around

Through this program, Saturn searched for a permanent placement for him for more than 1,300 days. Transcript (Docket Entry No. 421) vol. II at 260 (Kiphart). The Court finds as a matter of law that this period of time is well in excess of the reasonable amount of time required by the ADA. *Monday*, 118 F.3d at 1101–02. This is especially true in light of the 37 and 40 day searches which the Sixth Circuit found to be acceptable accommodations in *Monette* and *Ameritech.*

Additionally, for most of the 1,300–day search, Saturn further accommodated Mr. Kiphart by placing him in numerous temporary positions, during which he received his full salary and benefits. Transcript (Docket Entry Nos. 420 and 421) vols. I and II at 72–82, 90–93, 96–101, 133; 143–45, 147–52; 158–62, 241–42, 260 (Kiphart); plaintiff's Exh. 1. Saturn also accommodated Mr. Kiphart in 1996, by placing him in Step Four of the MMP which provided him with medical leave. *Cehrs*, 155 F.3d at 782. Finally, even though Mr. Kiphart asserts that he had to take the initiative in finding a position, on November 22, 1996, just seven months after he was placed at Step Four, the MPP successfully placed him on the steel blankers team, a vacant position in which Mr. Kiphart could rotate through all the team's assigned tasks.

The Court concludes that, based on these facts, a reasonable fact finder could only find that Saturn reasonably accommodated Mr. Kiphart pursuant to the require-

similar work goals. The goal of both Steps One and Two is to develop a reasonable accommodation plan, considering, but not limited to, ergonomic improvements, reassignment of team responsibilities, and provision of temporary work, that will provide temporary assignments or enable the team member to continue working in the same team and/or module in which the team member has been trained. Mr. McQuirter testified that Saturn set Steps One and Two at a total of 60 days because internal Saturn studies showed that 70 percent of Saturn's workplace injuries healed within 45 days. *Id.* at 1328–29 (McQuirter); defendant's Exh. 10 at 22; defendant's Exh. 11 at 23.

If the team member becomes fully functional and fully rotational within 60 days, either through healing or team and module adjustments, the team member exits the MPP. If Steps One and Two do not succeed within 60 days, however, the team member is eligible to move to Step Three of the MPP. Step Three covers the next 90 days of the team member's restrictions. When a team member reaches Step Three, that member has been unable to perform all the tasks on his or her team for approximately two months. At this point, Saturn continues to balance its legitimate interest in continuing the method it has chosen for the competitive manufacture of automobiles with the individual team member's placement needs. *Id.* at 1333–34 (McQuirter).

At Step Three, the team member remains fully employed, despite his or her inability to perform all the essential functions of his or her job for more than two months, and is considered for reassignment at Step Three to a temporary task somewhere on the Spring Hill site that he or she can accomplish within restrictions. The length of these temporary assignments varies, according to Saturn's need and the team member's abilities. During Step Three, the MPP staff considers and evaluates the team member for reassignment to vacant manufacturing positions site wide. The MPP staff meets with each team member multiple times during Step Three and solicits their input regarding the team member's interests and abilities through completion of Step Three interview forms and personal meetings. Priority among those in the MPP pool for placement into openings is determined first by each team member's medical restrictions, and then by each team member's length of time in the placement process. *Id.* at 1334–48, 1432 (McQuirter).

While a team member is at Step One, Two, and Three of the MPP, he or she is receiving 100 percent of his or her pay and all appropriate benefits. *Id.* at 1339–40 (McQuirter).

At Step Four the employee is put on medical leave, but is not terminated. *Id.* at 1362–64, 1366 (McQuirter). Also while at Step Four, Saturn's medical resources periodically review the team member's medical condition to assess the team member's status. Defendant's Exhs. 10 at 23 and 11 at 24.

While at Step Four, Mr. Kiphart received the same rate and schedule of pay as any team member on sickness and accident leave, that is, 100 percent of his base pay for 30 days, 80 percent of his base pay for the next 30 days, and 60 percent of his base pay thereafter. Transcript (Docket Entry No. 421) vol. II at 162–63, 262–63 (Kiphart); plaintiff's Exhs. 3–K, L.

ments of the ADA by providing him with a 1,300–day search for reassignment, temporary assignments, medical leave, and reassignment. *Monday*, 118 F.3d at 1101–02.

## IV.

■ In conclusion, the Court finds[19] that no reasonable trier of fact could conclude, based upon the evidence presented at trial, that, as defined by the ADA, Mr. Kiphart was disabled or was otherwise qualified to perform the essential functions of his position, with or without a reasonable accommodation. Additionally, the Court finds that no reasonable trier of fact could conclude that Saturn failed to provide Mr. Kiphart with a reasonable accommodation as required by the ADA. Accordingly, the Court finds that no reasonable trier of fact could find that Saturn discriminated against Mr. Kiphart on the basis of his alleged disability in violation of the ADA, 42 U.S.C. § 12101, *et seq.*

For each of the foregoing reasons, the Court shall grant Saturn's motion for judgment as a matter of law made at the conclusion of all the evidence. Mr. Kiphart's claims against Saturn will be dismissed.

An appropriate order will be entered.

### *ORDER*

In accordance with the memorandum contemporaneously entered, Saturn's motion for judgment as a matter of law, made

in open court at the close of all the evidence at trial,[1] is granted.[2]

The plaintiff Kiphart's action against the defendant, Saturn Corporation, is dismissed with prejudice.[3]

It is so ORDERED.

---

19. The Court recognizes that the defendants (Saturn and the two unions) moved for summary judgment before the trial of the pilot case and the motions were denied at that point. As noted in *Welker v. Goodyear Tire Co.*, 117 F.3d 1421, No. 96–3045, 1997 WL 369450 (6th Cir. July 1, 1997), the standard applied in a motion for judgment as a matter of law is essentially the same as the standard applied in a motion for summary judgment, although the standard is applied at different times in the litigation. The Court of Appeals further noted that the district court is simply not bound by its pretrial denial of a summary judgment after it actually considers the evidence ultimately presented at trial. Here, the Court deemed it important that this controversy be fully aired and a complete trial rec-

ord be made in a pilot case in view of the claims of the numerous remaining co-plaintiffs, as well as the state court cases that have now been removed to this Court.

1. The Court reserved its ruling on the motion and submitted the case to the jury.

2. The verdicts of the jury on the issue of liability (Docket Entry No. 414) and compensatory damages (Docket Entry No. 417) are vacated.

3. The entry of this order shall not constitute the judgment in Mr. Kiphart's case. A final judgment from which an appeal may be taken will be entered in due course.