*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0178P (6th Cir.)
File Name: 01a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RONALD JEFFREY KIPHART,
         *Plaintiff-Appellant,*

         *v.*

SATURN CORPORATION,
         *Defendant-Appellee.*

No. 99-6656

Appeal from the United States District Court
for the Middle District of Tennessee at Columbia.
No. 97-00054—Thomas A. Higgins, District Judge.

Argued: February 1, 2001

Decided and Filed: May 31, 2001

Before: DAUGHTREY and GILMAN, Circuit Judges;
COLLIER, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Mary A. Parker, PARKER & CROFFORD, Nashville, Tennessee, for Appellant. Robert E. Boston, WALLER, LANSDEN, DORTCH & DAVIS, Nashville,

_____

[*] The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

Tennessee, for Appellee.  **ON BRIEF:**  Mary A. Parker, Brenda Rhoton Little, PARKER & CROFFORD, Nashville, Tennessee, for Appellant.  Waverly D. Crenshaw, Jr., Thomas H. Lee, WALLER, LANSDEN, DORTCH & DAVIS, Nashville, Tennessee, for Appellee.

———————

**OPINION**

———————

CURTIS L. COLLIER, District Judge.  Appellant Jeffrey Kiphart, an employee of Appellee Saturn Corporation, suffers various hand, arm, and neck impairments restricting his mobility.  He sued Saturn, his local union, and his parent union under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (1995), after he was removed from his work team, moved through a series of temporary jobs, and finally placed on involuntary medical leave for seven months.[1]  Kiphart alleges Saturn improperly used its concept of job rotation, under which each member of a work team rotates through each of the jobs assigned to the team, to justify its refusal to place him on any team assigned one or more tasks he could not perform.  Kiphart bottoms his case on the gulf he says exists between the theory of job rotation and its practice at Saturn.

A jury found in favor of Kiphart.  The district court, however, ordered the clerk not to enter the verdict.  Six months later, the court granted Saturn's in-trial motion for judgment as a matter of law.  *Kiphart v. Saturn Corp.*, 74 F. Supp. 2d 769 (M.D. Tenn. 1999).  Kiphart appeals from the court's order.  Although this case touches on some fascinating issues concerning Saturn's labor-management partnership and its team-based manufacturing process, Kiphart asks us to decide only whether he presented sufficient evidence to support the jury's verdict in his favor.  We hold he did.  We

———————

[1]Kiphart has since returned to work.  The unions are no longer part of this lawsuit.

therefore **REVERSE** the district court's order and **REMAND** the case for calculation of post-judgment interest from March 19, 1999, the date the jury rendered its verdict, and for any other proceedings that may be necessary.

## I. FACTS

In 1984, General Motors ("GM") set out to create a "different kind of car company." GM hoped to use the new company to produce small cars competitively in the United States. Working in cooperation with the International United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), the union representing its employees, GM formed a committee to develop the Saturn concept. The committee, known as the "Group of 99,"[2] evaluated the business practices of various successful organizations, ranging from other automobile manufacturers to academic institutions, with an eye toward adopting the best strategies for use by the new company. The Group of 99 documented the results of its evaluation in a memorandum entitled "Concepts of the Saturn Organization." This memorandum, which is now known as the "Phase II Document," outlines the mission and philosophy of the Saturn Corporation.

### A. The Theory and Practice of the Job Rotation System

The Phase II Document discusses, among other topics, the concept of job rotation. This concept envisions the use of a system in which workers are grouped into teams, each of which is responsible for one step of the manufacturing process. Each team member would learn and perform each task required to accomplish the team's responsibilities. The team members would rotate through the team tasks throughout the work day. The Group of 99 identified various benefits flowing from the use of the job rotation system, including enhanced quality control, improved employee motivation and communication, increased employee

---

[2]The committee was initially comprised of fifty GM officials and fifty UAW officials. One member evidently dropped off the committee.

knowledge, and a more efficient allocation of human resources. One member of the committee, Ms. Danko, characterized job rotation as a "building block" of the Saturn Corporation.[3] Indeed, several long-time employees testified Saturn had touted the job rotation system as a benefit of employment during their orientation and training sessions.

The extent to which the job rotation system was manifest in the day-to-day operations of Saturn, and thus the extent to which job rotation constituted an "essential function" of the jobs of Saturn employees, is a central matter of contention between the parties. Saturn asserts the system is fundamental to its operation. Kiphart argues the system was neither fully implemented nor enforced, although he concedes its philosophy was widely known to Saturn employees. The trial record includes evidence supporting both positions. For example, some descriptions for job vacancies list as "required skills, abilities, and experience" the "willingness to rotate" or require that applicants "must rotate all jobs." Other job descriptions are silent about rotation.

But numerous Saturn employees testified that team members frequently did not fully rotate and instead swapped tasks with other team members. These witnesses explained this practice grew out of either personal aversion to certain tasks or physical inability to perform some tasks. Robert "Jeep" Williams testified he knew of numerous teams, including his, that did not fully rotate. Gary Merryman went as far as to say he did not know of a single team in which each member rotated through each job. Darla Gall Farmiloe explained that on one team, the women disliked one particular job and the men disliked another, so they swapped to suit their preferences. Gary Goforth and Tony Kemplin each testified that within some teams, employees with physical

---

[3]Ms. Danko testified the concept envisioned "a team working together, having knowledge of all the job functions to enhance their flexibility internally in terms of their ability to allocate their own resources, and to be able to communicate about problems that would come up in the course of doing their work."

## IV. CONCLUSION

Because we determine Kiphart presented sufficient evidence to support the jury's verdict, we **REVERSE** the district court's order granting judgment as a matter of law to Saturn. We **REMAND** the case to the district court for the calculation of post-judgment interest from March 19, 1999, the date the jury rendered its verdict, and for any other proceedings that may be necessary.

accommodating Kiphart by allowing him not to perform every team task would not have unduly burdened Saturn. Finally, a reasonable jury could have determined Saturn's policy of placing restricted employees on involuntary medical leave regardless of their ability to continue to perform in temporary positions was unreasonable. Accordingly, because Kiphart presented evidence from which the jury could have reached any one of these conclusions, we find judgment as a matter of law was inappropriate in this case.

## D.  The District Court Improperly Ordered the Jury Verdict Not Be Entered

Rule 58 of the Federal Rules of Civil Procedure gives a trial court discretion as to when a general verdict of a jury should be entered: "upon a general verdict of a jury . . . the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court." FED. R. CIV. P. 58. General principles of equity dictate a court's exercise of this discretion must be balanced with fairness to the parties. Moreover, as one of our sister courts has noted, the language of Rule 58—"the clerk . . . shall *forthwith* prepare, sign, and enter the judgment *without awaiting any direction by the court*"—together with "the policy underlying the prompt entry of judgment" auger in favor of entering a verdict when given, notwithstanding any pending motion for judgment as a matter of law. *See Marshall v. Perez-Arzuaga*, 866 F.2d 521, 523 n.8 (1st Cir. 1989) (quoting 6A JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 58.04[2] (3d ed. 1999)).

In this case, the district court ordered the jury's verdict not be entered forthwith. Six months later, the court granted a directed verdict for Saturn. Unfortunately, the court offered no explanation for either its decision or its long delay in acting on the motion for judgment as a matter of law. We see little cause for the district court to have delayed entry of judgment in this case, especially given that it would not have surrendered its authority to enter judgment as a matter of law by allowing the clerk to enter the jury's verdict forthwith.

limitations would occasionally trade tasks they could not perform in order to avoid being classified as medically restricted and thus possibly being placed on disability leave or losing their jobs. Furthermore, the record includes testimony that both Saturn and UAW supervisors knew team employees were not fully rotating among job tasks and that no employees had been disciplined for nonrotation.

The vice president of UAW Local 1853 testified a policy or procedure is not mandated unless it appears in the Memorandum of Agreement or in the company's Guiding Principles. Nowhere in the Memoranda of Agreement executed between Saturn and the UAW in 1994 and again in 1996 is there a requirement that employees rotate through every job assigned to their teams. In 1997, Saturn circulated a new version of its "Guiding Principles," its internal rules and policies, in which it introduced the requirement that all Saturn employees be "fully functional/fully rotational" (*i.e.*, be able to perform all the tasks assigned to the employee's team).

## B.  Saturn's Member Placement Program

Saturn classifies employees who report some physical limitation affecting work performance as "restricted." Since January 1, 1995, Saturn has placed restricted employees in its Member Placement Program ("MPP").[4] The MPP has four steps. In Step I, or "Work Unit Accommodations," restricted employees continue to work on their assigned teams, rotating around those tasks they cannot accomplish. A restricted employee may remain in Step I for up to thirty days. In Step II, or "Module Accommodations," restricted employees are removed from their teams and given temporary job assignments while Saturn searches for a permanent job

---

[4] Saturn negotiated the creation of the MPP with the UAW.

opening within the workers' "module."[5]    A restricted employee may remain in Step II for between thirty and sixty days.  If a restricted employee has not been permanently placed after sixty days, he is moved to Step III, which essentially is a continuation of Step II but may entail a temporary assignment outside of the worker's home module. A restricted employee may remain in Step III for ninety days. Step IV entails placing the restricted employee on medical leave. Restricted employees in Step IV do not report to work at the Saturn plant.  While a restricted employee is on medical leave, Saturn periodically reviews his case to assess his medical status and determine whether a position has opened in which he might be placed.

Saturn classifies each job vacancy as a primary or secondary opening, depending on how the position becomes open. A primary opening is created by an employee's leaving Saturn by discharge, death, voluntary termination, or transfer. Saturn also classifies newly created jobs as primary openings. A secondary opening is created when an employee transfers into a primary opening, takes a leave of absence longer than sixty days, or leaves a position as part of the MPP.  In 1995 and 1996, restricted employees in Steps III and IV of the MPP received priority in filling secondary openings, while any employee with seniority received priority in filling a particular primary opening for which he was fully rotational.  Since January 1, 1997, restricted employees in Steps III and IV of the MPP have received priority for all openings, whether primary or secondary.

During Steps I, II, and III of the MPP, restricted employees receive full salary and benefits.  No restricted employee participating in the MPP is eligible for overtime work, however.  A restricted employee placed in Step IV of the MPP receives full salary for thirty days, 80% of base salary for the next thirty days, and 60% for the next thirty days.

_____

[5]A module is the larger organizational unit to which a team is assigned. For example, a group of teams working around a similar set of tasks, such as making a car door or painting a car, forms a module.

following his removal from his original team.[13] In previous cases cited by the district court, we have held employers have reasonably accommodated employees through far shorter job searches of only thirty-seven and forty days. *See Monette*, 90 F.3d at 1173; *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).  However, the issue before the Court today is not susceptible to mathematical solution. Rather, we must decide only whether Kiphart presented sufficient evidence to support the jury's conclusion Saturn failed to reasonably accommodate Kiphart.  We believe he did.

The evidence shows that Saturn refused as a matter of policy to consider restricted employees for "primary" job openings unless they could perform all team tasks, even though its fully functional/fully rotational requirement was not officially implemented until 1997.  Saturn adhered to this policy despite its acquiescence to the widespread noncompliance with the job rotation system throughout its plant.  In Step IV of the Member Placement Program, moreover, Saturn placed restricted employees on involuntary medical leave regardless of their ability to continue to perform in temporary positions.

Based on this evidence, we find a reasonable jury could have determined Saturn failed to reasonably accommodate Kiphart.  Once it determined full task rotation was not an essential job function and Kiphart was otherwise qualified, the jury reasonably could have determined that, given the imperfect implementation of the job rotation system, Saturn's de facto requirement that only restricted employees be fully functional/fully rotational was unreasonable.  For the same reasons and considering Kiphart's testimony he frequently was able to perform all but one or two team tasks, the jury could reasonably have concluded the hardship of

_____

[13]While he was working during this time, Kiphart received his full salary, although he was ineligible for overtime assignments.  As the district court emphasized, Kiphart was placed on leave for only seven months of that time.  Saturn eventually placed Kiphart in the position he now holds.

to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1). Reasonable accommodation may include job reassignment. *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 634 (6th Cir. 1999) ("The ADA plainly states that re-assignment may be required to reasonably accommodate a worker with a disability."). In the context of the Rehabilitation Act, the Supreme Court has held, "Although [employers] are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 289 n.19 (1987). The same logic applies under the ADA. When job reassignment is appropriate, as the district court noted, an employer "should reassign the individual to an equivalent position . . . if the individual is qualified, and if the position is vacant within a reasonable amount of time." 29 C.F.R. § 1630.2(o) app. at 358; *see also id.* § 1630.2(o)(2)(ii) ("*Reasonable accommodation* may include but is not limited to . . . reassignment to a vacant position . . . .").

The district court found Saturn had reasonably accommodated Kiphart through his participation in the Member Placement Program. Indeed, Saturn admirably found temporary jobs for Kiphart for most of the 1300 days

## C. Kiphart's Employment at Saturn

On October 16, 1990, Kiphart began work at Saturn as an operating technician on the door panel install team. One of four tasks assigned to Kiphart's team involved the use of a six-pound screw gun. The screw gun required two hands to operate. In December 1991, Kiphart began experiencing pain in his left arm and elbow. In time, the pain evolved into numbness and tingling in both arms. He attributed his condition to his repeated use of the screw gun.

Kiphart was diagnosed with tendinitis and placed on medical restriction to prevent repetitive use of his hands.[6] He was not taken off the team. Eventually, he could no longer use the screw gun, and his team members had to perform the task requiring its use. Although his condition had not improved, Kiphart allowed his medical restriction designation to expire. He believed his coworkers had begun to treat him differently due to his restrictions and felt put out by his inability to perform all team functions.

Kiphart's condition continued to cause him pain when he worked, and he once again requested a medical restriction. Saturn's medical director issued a restriction on June 29, 1992, which stated: "No hand power tools, no repetitive, frequent twisting of the arms and elbows and no flexing of the wrists, no lifting over 20 pounds until seen by medical director." The lifting restriction was later raised to thirty pounds.

In October 1992, Saturn removed Kiphart from his position on the door panel install team and temporarily placed him on another team. Although his pay and benefits were unchanged, he was not eligible to work overtime. After three months, the worker whom Kiphart had temporarily replaced returned from leave, and Saturn assigned Kiphart to a second temporary

---

[6]Because Saturn had not yet instituted it, Kiphart was not placed in the MPP at this point in his tenure at Saturn.

position. For the next few years, Saturn moved Kiphart from one temporary assignment to another.

Kiphart identified numerous permanent jobs he believed he would be able to fill. He applied for such positions to Dwight McQuirter, Saturn's site-wide placement coordinator. McQuirter declined Kiphart's applications, believing Kiphart's restrictions rendered him unable to be fully rotational in those positions. McQuirter stated it was "generally accepted," even if not required by the Guiding Principles then in effect, that he could not place a restricted employee unless the employee would be fully functional/fully rotational in the new position. However, the record shows McQuirter knew teams without any restricted workers were not rotating fully. Georgia Ann Lindstrom, a leader of UAW Local 1853, testified she met with McQuirter in 1995, at which time she expressed her concern that Saturn was not placing restricted employees in open positions. When she asked McQuirter how many open positions were then available, he allegedly said, "I have twelve jobs here and I'm not placing anybody until I have to go to court." McQuirter denies making such a statement.

On May 8, 1995, McQuirter informed Kiphart by letter he had been retroactively placed in Step III of the MPP as of March 1, 1995. In July 1995, Kiphart began to experience pain in his neck. Saturn's doctors placed him on an additional medical restriction, stating he was not to twist or bend his neck repetitively or turn his head from side to side more frequently than ten times per minute. Between August 22, 1995 and December 8, 1995, Kiphart was on a medical leave related to complications of a herniated disk. On October 11, 1995, he underwent surgery to repair the herniated disk. When he returned to work, Saturn made his neck and arm restrictions permanent.

After the surgery, Dr. Joseph Wade, Kiphart's orthopaedic surgeon, gave him a permanent partial impairment rating of fifteen percent. Dr. Wade testified Kiphart suffers from tendinitis, bilateral chronic ulnar neuropathy, and a fused

The evidence presented speaks directly to the EEOC criteria used in determining whether removal of a job function would fundamentally alter the position. Saturn considered full rotation to be an essential function but did not list it as a requirement in all job descriptions. Although in theory an employee's entire time at work should involve rotating, Kiphart presented proof that, as a practical matter, very few if any teams fully rotated tasks. Hence, the actual consequences of not requiring employees to rotate fully appear far less severe than Saturn suggests. Nowhere in Saturn's labor agreements with the UAW covering the relevant time period is there a requirement that employees rotate through every job assigned to their teams. Indeed, Saturn did not formally announce that all employees had to be fully functional/fully rotational until 1997 (in a new version of its "Guiding Principles"), *after* Kiphart had returned to work. Finally, various members of teams that did not fully rotate indicated their teams still accomplished their assigned tasks. Accordingly, we find a reasonable jury could infer from the cumulative weight of the evidence that full task rotation was not an essential job function and Kiphart was otherwise qualified.[12]

## C.   Evidence Saturn Failed to Provide "Reasonable Accommodation"

Employers are required to provide "reasonable accommodation" to qualified employees with a disability. 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodation" means:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability

---

[12]We note the district court did not specially ask the jury to answer whether full task rotation is an essential job function. Hence, we do not hold that it is (or is not). Rather, we hold only that Kiphart presented sufficient evidence to allow a reasonable jury to conclude full task rotation was not an essential job function.

A central issue in this case is whether being fully functional/fully rotational is an essential job function of work at the Saturn plant. "[T]he determination of whether a given function is 'essential' within the meaning of the ADA and regulations promulgated thereunder is typically a question of fact and thus not suitable for resolution through a motion for judgment as a matter of law . . . ." *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998). The district court found as a matter of law "a reasonable factfinder must conclude that job task rotation is an essential function of the job." *Kiphart*, 74 F. Supp. 2d at 781. We disagree.

At trial, Saturn made much of the essential role the job rotation concept plays in its operational vision. Various employees testified they knew of this vision even before accepting jobs at the Saturn plant. Saturn also introduced evidence of its implementation of the job rotation system. For example, certain job announcements clearly stated the ability to fully rotate was a necessary qualification. Similarly, some participants in the MPP testified they understood they could not reassume their former team positions because they were not fully functional/fully rotational.

Yet Kiphart introduced significant countervailing evidence. Some job announcements did not list the ability to rotate fully as a necessary qualification, suggesting (when juxtaposed with Saturn's proof) that not all jobs required fully rotational team members. More to the point, numerous employees testified the teams simply did not operate as envisioned under the job rotation system. On some teams, members swapped tasks among themselves to satisfy personal preferences—apparently with the knowledge of management. Some witnesses testified they knew of not one team that fully rotated job tasks. These witnesses further stated their belief Saturn was not harmed by the partial adherence to the job rotation system. In fact, the evidence presented suggests that, prior to 1997, the only time Saturn fully implemented its job rotation concept was when it placed employees with medical restrictions. Then, and only then, did it require applicants for permanent openings to be fully functional/fully rotational.

cervical spine at the C6-C7 level. As a result of these conditions, Dr. Wade restricted Kiphart from lifting more than thirty pounds, repetitive bending of arms, repetitive flexing, extending or rotating his neck more than ten to twelve times per hour, using air vibrating power tools, engaging in prolonged work with his elbow in a flexed or bent position, or lifting objects with his palms facing down.

Dr. Robert Bain, who treated Kiphart for chronic depression and anxiety, testified Kiphart complained of "aching from his head to his feet" and "fatigue to the point that during the work day he had to stop and take a nap some days." Kiphart testified he can no longer engage in various of his pastimes, including bowling, taking long drives, making custom hunting knives, and roofing houses. He testified his depression affects "every aspect" of his life, keeping him from sleeping well and performing both enjoyable activities like socializing and mundane ones like yard work.

While Kiphart was in the temporary job pool, Saturn instructed him, along with the other restricted employees, to report to the plant cafeteria, where he waited until he was assigned a job to perform. Kiphart testified he felt segregated, singled out, and stigmatized while waiting in the cafeteria. Ms. Lindstrom testified the practice of putting restricted employees in the cafeteria was a "joke around the plant," stating other employees would make faces and aim looks of disgust at the restricted workers. Moreover, the Saturn plant at which Kiphart worked prominently displayed a large board listing the names of its employees and the current employment status of each. Saturn placed a black dot next to the names of those employees with medical restrictions, identifying them as restricted employees.

On April 18, 1996, Saturn moved Kiphart to Step IV of the MPP and placed him on involuntary disability leave. Kiphart testified that his depression worsened while he was on medical leave. Other evidence suggests his wife and son also were emotionally affected by his job instability and the specter of financial hardship. Kiphart's wife testified the

family had to borrow $10,000 from relatives to meet its living expenses.[7] While in Step IV, Kiphart went to the Saturn plant almost daily to try to locate a permanent position.

On November 22, 1996, Kiphart returned to work. Saturn placed him in a permanent position on the body systems steel module blankers team. He continues to hold this position and is able to perform all ten team tasks without accommodation. The parties stipulate Kiphart's total economic loss during his time in the MPP is $21,298.11. Saturn's search for a position in which Kiphart could be fully functional/fully rotational lasted over 1300 days.

### D.  Procedural History

This case originally was part of a lawsuit brought by seventy-seven Saturn employees against Saturn, the UAW International, and UAW Local No. 1853. The complaint alleged race, age, and sex discrimination under state and federal laws, disability discrimination under the ADA, claims of breach of the duty of fair representation and breach of fiduciary duty against the unions, and other claims. The plaintiffs based their case on a creative legal theory. In recognition of Saturn's unique management structure, the plaintiffs named the unions as defendants, averring they were co-employers with Saturn. Under the plaintiffs' theory, the unions were jointly liable as employers for any violations of the anti-discrimination laws.

The lawsuit radically metamorphosed after its original filing. By voluntary dismissal and agreed order, eighteen plaintiffs were dismissed altogether and all claims, save those brought under the ADA, were dismissed without prejudice by the remaining plaintiffs. The plaintiffs collectively refiled their ADA claims in state court. The defendants then

_____

[7]In accordance with the MPP, Kiphart received 100% of his base salary for the first thirty days, 80% for the next thirty days, and 60% for the next thirty days.

Based on the evidence of the pervasive and permanent nature of Kiphart's impairments to his hands, arms, and neck, we find a reasonable jury could have determined Kiphart's impairments substantially limited his ability to perform an entire class of manual activities associated with assembly-line and product-handling jobs involving the use of vibrating hand-held power tools and requiring frequent, repetitive twisting, bending, or flexing of the wrists, elbows, or neck. Because we conclude Kiphart presented sufficient evidence showing he is substantially limited in his ability to perform manual tasks, we need not query whether he is substantially limited in his ability to perform other major life activities.

### B.  Evidence Kiphart is "Otherwise Qualified"

An ADA plaintiff is "otherwise qualified" if he is disabled but nonetheless, "with or without reasonable accommodation, can perform the essential functions of the employment position [he] holds or desires." 42 U.S.C. § 12111(8). A job function is essential if its removal would "fundamentally alter" the position. 29 C.F.R. § 1630.2(n) app. at 356. Whether the removal of the job function would fundamentally alter the position is determined by looking at such factors as

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

*Id.* § 1620(n)(3).

limited as to the major life activity of performing manual tasks. *Id.*; *cf. Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1224 (11th Cir. 2000) (distinguishing its facts from *Williams* based upon the nature of the plaintiff's impairments, which rendered him unable to perform only a narrow range of jobs causing wrist pain).

Like the plaintiff in *Williams*, Kiphart presented evidence his tendinitis and ulnar neuropathy prevented him from performing repetitive manual motions.  He testified he could not perform the repetitive work required of an operations technician on the door panel team, his original position, because he could not pick up or hold the six-pound screw gun, pull car doors off the assembly line, or repeatedly place clips on car doors.   Saturn's medical staff specifically identified "a class of manual activities" Kiphart was not to perform: no use of hand power tools, no repetitive, frequent twisting of the arms and elbows, and no flexing of the wrists. The staff also instructed him not to twist or bend his neck repetitively, turn his head from side to side more frequently than ten times per minute, or lift over thirty pounds.  Saturn made Kiphart's neck and arm restrictions permanent in 1995, following the fusion of two of his vertebrae.  Likewise, Kiphart's own physician gave him a permanent partial impairment rating of fifteen percent, instructing him not to lift more than thirty pounds, repetitively bend his arms, repetitively flex, extend, or rotate his neck more than ten to twelve times per hour, use air vibrating power tools, engage in prolonged work with his elbow in a flexed or bent position, or lift objects with his palms facing down.  Kiphart also testified he could not perform the repetitive tasks required of his former factory and assembly line jobs, including folding flaps on boxes, using a glue gun, using power screwdrivers and other vibrating power tools, and using guns hanging overhead.[11]

---

[11]Kiphart also testified he could no longer perform household jobs like mowing the lawn, cleaning the siding on his house, painting, or washing the car.

removed the case to the United States District Court for the Middle District of Tennessee.

At a pretrial conference, the district court determined it would try the ADA claims of a single plaintiff first, "to expedite the disposition of the claims of the remaining plaintiffs." *Kiphart*, 74 F. Supp. 2d at 772.  The district court asked the parties to negotiate which plaintiff's case should serve as a test.  Apparently, the parties were not able to agree on a plaintiff, so the district court selected Mr. Kiphart and decided to hold the remaining claims in abeyance pending the final outcome of his case.[8]

---

[8]There is some evidence Kiphart was the defendants' preferred plaintiff.  At a pretrial conference, the following colloquy took place regarding the court's selection:

[PLAINTIFFS' COUNSEL]: Jeff Kiphart was someone who was so disabled and had so many issues that he could do only two jobs out of ten on his team.  There are lots of other people that could do ten out of eleven jobs or nine out of ten jobs, who, you know, the task rotation issue is a much more understandable issue of why it's not an essential function or it shouldn't be when they're just having to hop over one job.  When you take someone who is so disabled they can't do hardly anything, it's a whole different presentation of facts, and it's really weighted in favor of the defense's position that they shouldn't have to accommodate someone like that.

THE COURT: But it's off set by the fact that your man's got an unquestioned disability.

[PLAINTIFFS' COUNSEL]: That's true.

THE COURT: And that gives your side a leg up.  I mean if you make the cash register ring, you'll get the full price for it, for Mr. Kiphart, because the off setting point is that there isn't much challenge as I take it to Kiphart's bona fides of his disabilities.

[SATURN'S COUNSEL]: We don't concede it, but he's a lot closer to the statutory definition of a qualified person with a disability.

Kiphart's case proceeded to jury trial. At the close of Kiphart's proof, the court granted the UAW International's motion for judgment as a matter of law. At the close of all evidence, Saturn and Local 1853 moved for judgment as a matter of law. The court granted Local 1853's motion and took Saturn's motion under advisement.[9] On March 19, 1999, the jury returned a verdict for Kiphart by giving the following answers to five seminal questions:

(1) Was the plaintiff an individual with a disability as defined by the Americans with Disabilities Act? *Yes*.
(2) Was the plaintiff otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation? *Yes*.
(3) Did the plaintiff suffer an adverse employment action solely by reason of this disability? *Yes*.
(4) Did the plaintiff inform the defendant that reasonable accommodations were needed because of the plaintiff's disability? *Yes*.
(5) Did the defendant make good faith efforts, in consultation with the plaintiff, to identify and make a reasonable accommodation that would provide the plaintiff with an equally effective opportunity at the workplace and that would not cause an undue hardship on the operation of the defendant's business? *No.*

The jury awarded Kiphart $90,000 in compensatory damages. The court instructed the clerk not to enter judgment on the jury's verdict. On May 10, 1999, Kiphart moved the court to enter the jury's verdict. On September 30, 1999, the court denied the motion and granted Saturn's motion for judgment as a matter of law. *Kiphart v. Saturn Corp.*, 74 F. Supp. 2d 769 (M.D. Tenn. 1999). Kiphart now appeals the district court's order and asks that the jury's original verdict be entered.

---

[9] Kiphart has not appealed the district court's dismissal of the unions from the case. Accordingly, the issue of their status as joint employers is not before us on appeal.

substantially limited with respect to any other major life activity").

We have previously held the ability to perform manual tasks is a major life activity. *Williams v. Toyota Motor Mfg., Ky., Inc.*, 224 F.3d 840 (6th Cir. 2000), *cert. granted*, 69 U.S.L.W. 3481 (Apr. 16, 2001). To demonstrate a substantial limitation in the performance of manual tasks, a plaintiff must prove his "manual disability involves a 'class' of manual activities affecting the ability to perform tasks at work." *Id.* at 843. In *Williams*, the plaintiff, an assembly line laborer, developed carpal tunnel syndrome and tendinitis in her hands and arms. Toyota first moved her to a position in the paint inspection section. Later, Toyota expanded her assignment to include wiping down cars using a sponge attached to a block of wood. This aspect of the job required her to grip the block and work repetitively with her hands and arms at shoulder height for several hours at a time. When her tendinitis spread to her shoulder and neck, she requested Toyota alter her assigned tasks. Toyota allegedly refused, and she sued under the ADA. The court held "the plaintiff's set of impairments to her arms, shoulders and neck [were] sufficiently disabling to allow the factfinder to find she crosses the threshold into the protected class of individuals under the ADA who must be accorded reasonable accommodation." *Id.*

The central issue in *Williams* was whether the plaintiff was disabled within the meaning of the ADA and, in particular, whether her impairments substantially limited some major life activity. The *Williams* panel analogized the nature of the plaintiff's tendinitis and carpal tunnel syndrome to the pervasive impairments of a person with a missing, damaged, or deformed limb, concluding her impairments prevented her performance of "tasks associated with certain types of manual assembly line jobs, manual product handling jobs and manual building trade jobs (painting, plumbing, roofing, etc.) that require the gripping of tools and repetitive work with hands and arms extended at or above shoulder levels for extended periods of time." *Id.* Hence, the court held there was sufficient evidence to support a finding she was substantially

regulations offer guidance, determining whether an impairment substantially limits a person in a major life activity ultimately requires an individualized, fact-specific inquiry into the effect of an impairment on a plaintiff's life. *Sutton v. United Airlines*, 527 U.S. 471, 483 (1999) ("The definition of disability . . . requires that disabilities be evaluated 'with respect to the individual' and be determined based on whether an impairment substantially limits the 'major life activities of such individual.'"); 29 C.F.R. § 1630.2(j) app. at 352 ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

The district court instructed the jury that Kiphart alleged his impairments substantially limited a variety of major life activities, including the ability to work, to perform certain manual tasks, to lift more than thirty pounds, to bend his arms repetitively, to use air or vibrating tools, to extend, flex, and rotate his neck more than ten times a minute, to think, concentrate, interact with others, and to sleep. The court did not require the jury to identify the particular major life activity upon which its based its conclusion Kiphart was disabled.

The written and oral arguments submitted to us suggest both parties assume that working is not only a major life activity, but also the major life activity at issue in this case. While we recognize well the question of whether working constitutes a major life activity under the ADA is (to say the least) an unsettled point of law, *see Sutton*, 527 U.S. at 491, we do not address that precise issue today, for it is not squarely before us. Rather, we need only address whether a reasonable jury, assessing the proof in the light most favorable to the plaintiff, could determine Kiphart was substantially limited in any one of the major life activities identified by the district court. *See id.* at 492 (stating that substantial limitation in working should be viewed as a last resort claim and be considered only if "an individual is not

## II. STANDARD OF REVIEW

This court reviews de novo a district court's order granting judgment as a matter of law. *Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000) (further citations omitted)). "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999). "[U]nless this Court 'is left with the definite and firm conviction that a mistake resulting in plain injustice has been committed,' or unless the verdict 'is contrary to all reason,' we must affirm the jury's verdict." *Schoonover v. Consolidated Freightways Corp. of Del. Local 24*, 147 F.3d 492, 494 (6th Cir. 1998). "We do not weigh the evidence, evaluate the credibility of witnesses, or substitute our own judgment for that of the jury. Rather, this court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 398 (6th Cir. 1998). Thus, we must determine whether, viewing the evidence in his favor, Kiphart presented sufficient evidence to support the jury's verdict.

## III. DISCUSSION

The Americans with Disabilities Act forbids an employer to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is

an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).

When, as here, a plaintiff presents direct evidence his employer relied on his disability in making an employment decision, he bears the burden of establishing (1) he is "disabled" and (2) he is "otherwise qualified" for the position despite his disability, either with or without reasonable accommodation or with an allegedly "essential" job requirement eliminated. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). His employer then bears the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that the proposed accommodation would impose an undue hardship. *Id.* Kiphart claims Saturn failed to reasonably accommodate him by denying him permanent positions for which was otherwise qualified and by placing him on involuntary medical leave for seven months. Saturn asserts Kiphart could not perform the essential functions of the jobs for which he had applied because he was not fully functional/fully rotational.

In its order granting Saturn judgment as a matter of law, the district court found Kiphart had not met his burden of proof with evidence sufficient to lead a reasonable jury to conclude he "was disabled or otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation." *Kiphart*, 74 F. Supp. 2d at 783. The court further found no reasonable jury could conclude Saturn had failed to provide Kiphart with a reasonable accommodation, given its efforts over 1300 days to reassign him to a new permanent position. *Id.* We disagree.

## A.  Evidence Kiphart is "Disabled"

The threshold issue in any action brought under the ADA is whether the plaintiff is a person with a disability. A person is "disabled" within the meaning of the ADA if he (1) has some impairment substantially limiting him in one or more

major life activities, (2) has a record of such an impairment, or (3) is regarded by his employer as having such an impairment. *See Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999).

In this case, Kiphart's impairment may be assumed.[10] The question is, then, whether Kiphart's impairment substantially limited him in a major life activity. Congress did not define the parameters of either a substantial limitation or a major life activity when it drafted the ADA. Regulations codified by the Equal Employment Opportunity Commission ("EEOC") indicate a person is substantially limited if he or she is

(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (2000). The EEOC regulations include among major life activities "those basic activities that the average person in the general population can perform with little or no difficulty." *Id.* § 1630.2(i) app. at 352. The EEOC's illustrative but not exhaustive list of such activities includes "sitting, standing, lifting, reaching," *id.* § 1630.2(l), and "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working," *id.* § 1630.2(i) (repeating the list of major life activities enumerated in 34 C.F.R. § 104.3(j)(2)(ii), the regulations implementing § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1999)). Although the EEOC

---

[10]Kiphart presented evidence he suffers from "bilateral chronic ulnar neuropathy, tendinitis, a fused cervical spine at the C6-C7 level, and chronic depression." *Kiphart*, 74 F. Supp. 2d at 775. The district court "assume[d], without deciding, a reasonable trier of fact could conclude that Mr. Kiphart's ailments were impairments under the ADA." *Id.*