MARTHA CRAIG DAUGHTREY,
Circuit Judge, dissenting.
A review of the annual report of dispositions by this court would reveal that each year we process several hundred section 1983 actions brought by state and federal prison inmates scattered throughout the Sixth Circuit. I would venture to guess that at least 90 percent — and probably even closer to 100 percent — of those cases come to us by way of summary judgment granted by the district court and are affirmed on appeal, virtually out of hand. Almost none of the cases that we review involves a jury verdict, let alone a jury verdict in favor of a plaintiff, because respondents routinely and successfully invoke the doctrine of qualified immunity. Indeed, when a district judge does find a material dispute of fact that prevents a grant of summary judgment and sends a section 1983 claim to trial, the plaintiff, being an inmate, is unlikely to arouse the sympathy of a jury of 12 law-abiding, “free-world” peers. This, then, is the exceedingly rare instance in which an inmate’s claims not only survived the prison officials’ defense of qualified immunity but, after a jury trial, also resulted in a significant monetary award of damages in the prisoner’s favor. Nevertheless, the majority in this appeal has managed to extin *456 guish that award by overturning the jury verdict and finding, contrary to the decision of the district court, that the respondents are entitled to qualified immunity. In view of the uncontested facts before the district court and the jury, I view this result as a legal travesty, and I therefore dissent.
There is arguably room for disagreement about the liability of Rebecca Bright. The majority emphasizes what it sees as a flawed pleading that, in its judgment, prevents the plaintiffs reliance on a retaliation theory of recovery. But the majority concedes that she alleges in her complaint that Bright placed her in isolation “with a distinctly punitive purpose.” Hence, the majority’s basis for rejecting the retaliation claim seems hyper-technical at the very least. Equally unpersuasive is the majority’s endorsement of Bright’s invocation of Ohio Administrative Code § 5120-9-11, governing “security control and disciplinary control,” as justification for Ortiz’s transfer to isolation, an action that clearly affected her adversely. Even a superficial reading of that administrative code section reveals that the authority to isolate an inmate pending investigation of a rule violation applies to the rule violator, not the victim of the violation, to the inmate threatening disruption, not the inmate who has suffered from disruption during his or her incarceration. We have in the record a prison psychologist’s report that Ortiz was “not handling [isolation in] the ARN complex very well” and was ill and vomiting, as well as prison records showing that she spent the following week in the prison infirmary recovering from the ill-effects of Bright’s order relegating Ortiz to “the hole,” purportedly for discussing the assaults that she had endured with other inmates. Viewing this evidence in the light most favorable to Ortiz, it seems evident that Bright’s action could reasonably be found by a jury to constitute illegal retaliation.
But if there is any room for disagreement about Bright’s liability in this case, there is none at all concerning Jordan’s liability, because it was her deliberate indifference to a known risk to Ortiz that made the second assault by Douglas Schultz possible, if not inevitable. Ironically, the majority opinion that robs Ortiz of her victory before the jury also proves her case by setting out as fact the following:
• Ortiz reported the initial incident to Officer Hall on Saturday morning, presumably including Schultz’s threat to “get [her] tomorrow” as she fended him off on Friday night.
• Hall took the complaint seriously, escorting Ortiz to Jordan’s office and repeating to Jordan what Ortiz had told him before he left, including the name of the officer in question.
• Rather than report the incident immediately, as prison policy required, or take security measures to prevent another assault, as reason would dictate, Jordan merely reminded Ortiz that Saturday was Schultz’s last day at the prison and told her to “keep in mind that the man was leaving.”
• At the same time, Jordan noted that Schultz “[wa]s just a dirty old man” and that his assaultive behavior toward her the night before “was his nature.”
• Despite Schultz’s threat to “get” Ortiz on Saturday, Jordan failed to arrange protection against a second assault and instead, in the words of the majority, “encouraged Ortiz to ‘hang out with [her] friends’ for the rest of the day so that Schultz would not have the chance to be alone with her,” advice that Ortiz followed, to her detriment.
• Jordan also convinced Ortiz not to file a formal complaint because it was Schultz’s last day before his transfer to another prison facility, telling Ortiz, again in the *457 words of the majority, “that ‘if anything happen[ed]’ again, she could report it on Tuesday, when Jordan came back to work.”
• As summarized by the majority, “[a]fter her conversation with Ortiz, Jordan purportedly wrote up an incident report detailing her version of the conversation and put it in her work bag” and “[forgot] to drop it off in a mailbox outside the warden’s office, where such reports were normally placed,” instead “turning] it in ... the following Tuesday, when she returned to work after a holiday weekend.”
Significantly, rather than intervene in some reasonable way on Saturday, Jordan reported the situation to no one, instead leaving Ortiz with instructions to rely on a makeshift “buddy system” for protection from Schultz — one that proved to be sadly inadequate, as it turned out. Equally significant was Bright’s testimony at trial that “if Jordan had reported the first incident immediately, ‘the proper people would have taken a role in protecting Mrs. Ortiz’.” But, leaving an inmate such as Ortiz wholly unprotected in the face of a known risk of an assault has repeatedly been held by this court and others to amount to deliberate indifference sufficient to establish liability under section 1983. See, e.g., Seicluna v. Wells, 345 F.3d 441, 445-46 (6th Cir.2003) (holding that qualified immunity did not protect defendant guard where plaintiff was “a member of an identifiable group of prisoners for whom risk of assault was a serious problem”); Street v. Corrections Corp. of Am., 102 F.3d 810, 815 (6th Cir.1996) (observing that defendant guard’s failure to act based on attacker’s threatening statements could constitute deliberate indifference); Giroux v. Somerset County, 178 F.3d 28, 34 (1st Cir.1999) (“When a supervisory official is placed on actual notice of a prisoner’s need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for a prisoner’s safety.”); Walsh v. Mellas, 837 F.2d 789, 797 (7th Cir.1988) (finding that “failure to respond to the known danger of assault upon a member of an identifiable group of prisoners that are targeted by gangs ... reaches the Eighth Amendment standard of liability — deliberate indifference to a known hazard”).
The jury credited Ortiz’s testimony, as well as that presented in her behalf, and we are charged to review the record in the light most favorable to her. See Kiphart v. Saturn Corp., 251 F.3d 573, 581 (6th Cir.2001) (“We do not weigh the evidence, evaluate the credibility of witnesses or substitute our own judgment for that of the jury.”). Although the majority’s opinion sets out facts that obviously support the plaintiffs claims, those facts appear to carry no weight or substance with the majority. Moreover, the majority pays no discernible deference to the fact that the judgment in this case rests on a jury verdict. See Radvansky v. City of Olmsted-Falls, 496 F.3d 609, 614 (6th Cir.2007) (noting that jury verdicts are due substantial deference). Given the legal posture of this case and the strength of the evidence against defendants Bright and Jordan, the majority’s decision to overturn the jury’s verdict strikes me not just as an unfortunate result in this case, but as one that is thoroughly senseless. I therefore dissent.